J-A29034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ERIC SCOTT NEFF AND NAOMA D. NEFF | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | No. 728 WDA 2019 |
| PNC BANK, NATIONAL ASSOCIATION, LUCILLE J. ONTKO AND CITIBANK, NATIONAL ASSOCIATION | : | |

Appeal from the Order Entered April 11, 2019
In the Court of Common Pleas of Butler County Civil Division at No(s):
A.D. No. 2012-11119

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:  **FILED FEBRUARY 20, 2020**

Eric Scott Neff and Naoma D. Neff, husband and wife (Neffs), appeal from an order of the Court of Common Pleas of Butler County (trial court) denying their motion for summary judgment and granting the motions for summary judgment of PNC Bank, N.A. and Lucille J. Ontko (collectively, PNC) and Citibank, N.A. (Citibank).

**I.**

Like other cases involving the parties, this appeal arose out of the Neffs' desire to refinance a 2006 mortgage and loan (Loan) it had with

_____

[*] Retired Senior Judge assigned to the Superior Court.

PNC Bank, National Association (PNC) that encumbered the property they owned located on or near Saint Joe Road, Chicora, Pennsylvania, 16025 (Property). Within two weeks of the 2006 Loan's closing, the Neffs took steps to subdivide the 20-acre Property that had been used to secure that Loan. (Record (R.) 634a-35a). Effective October 20, 2006, the Property was subdivided into two separate parts: (i) a 1.39-acre parcel which retained the Property's original tax ID number 250 1F104-3 (Parcel One) on which the house was located and, (ii) an 18.33-acre parcel that was given the new tax ID number 250 1F104-3B (Parcel Two).

The Neffs contend that in early 2007, they spoke to a PNC branch employee named Marilou Hollinger requesting an increase over the 2006 mortgage but only wanted to encumber Parcel One on which the house stood. They also claim that Ms. Hollinger informed them that PNC agreed that the 2006 mortgage would be secured only by Parcel One. (R. 2156a).

At that time, PNC participated in an Expanded Credit Program aimed at borrowers whose credit scores were too low to meet PNC's ordinary underwriting guidelines to refinance their home equity loans. (R. 645a). Under this program, Citibank made the underwriting decision about whether to extend the loan, but PNC made the loan. *Id.* PNC employees communicated with borrowers, processed their loan

applications, and did everything necessary to close the loans. (R. 645a, 1727a-28a.) After closing, PNC would assign the loan to Citibank, which both owned and serviced it. (R. 645a).

On January 16, 2007, the Neffs executed a mortgage (Mortgage) as security for payments and other obligations of the principal sum of $256,498. Eric Scott Neff signed a promissory note on the same day with the same terms and conditions. The loan was payable in equal, consecutive monthly installments of principal and interest of $2,152.29. Importantly, when the 2007 Mortgage was executed, it identified only "Tax Parcel No. 250-1F104-3" (Parcel One) as being encumbered by the Mortgage.

After closing on the 2007 Mortgage documents but prior to recording, Lucille Ontko (Ontko), a clerk at PNC, added Tax Parcel No. 250-1F104-3B (Parcel Two) to the Mortgage in pen and ink prior to recording. This addition meant the 2007 Mortgage encumbered the same property subject to the prior 2006 mortgage.

On January 19, 2007, PNC assigned the mortgage, promissory note and indebtedness to Citibank. The Neffs remained current on their obligations until they missed the $2,834 monthly payment due in February 2010. (R. 477a). The Neffs submitted a payment of $2,834 on or about March 17, 2010, but it was insufficient to cover both the

payment missed in February 2010 and the payment due in March 2010. *Id.*

On March 15, 2010, Mr. Neff sought a loan modification from Citibank. He maintains that certain Citibank employees informed him by phone that to be considered for a loan modification, he had to be in arrears on the mortgage payments and they "strongly implied" that if the Neffs allowed the Mortgage to go into default, they would be eligible for a modification of the loan. Acting in reliance upon those instructions, the Neffs contend that they stopped making the monthly mortgage payments in order to be eligible for the loan modification. They did not receive a mortgage modification from Citibank.

Because the Neffs failed to make the obligated monthly mortgage payments as well as required escrow payments for real estate taxes and insurance since April 2010, on June 27, 2011, Citibank filed a complaint in mortgage foreclosure seeking foreclosure and sale of the Property. Then, on October 3, 2011, Citibank assigned the Mortgage, promissory note and indebtedness to PennyMac Corporation (PennyMac), who then filed an amended complaint.[1]

---

[1] ***PennyMac Corp v. Eric Scott Neff and Naoma D. Neff***, Court of Common Pleas of Butler County, No. 2011-10829. The trial court granted partial summary judgment and ordered foreclosure against Parcel One. The Neffs appealed to this court at 727 WDA 2019.

Based on the aforesaid, the Neffs filed a five-count complaint seeking compensatory and punitive damages[2] of which only four are before us in this appeal.[3]

- Count I is against PNC and Ontko claiming that PNC breached the Mortgage contract by altering the Mortgage to add Parcel Two to what was encumbered by the Mortgage adding the additional parcel.

- Count II is a claim against the same defendants claiming that they were fraudulently induced to sign the Mortgage because they claimed that a PNC employee (Ms. Hollinger) had persuaded them to sign the 2007 Note and Mortgage by assuring them that the mortgage would apply only to Parcel One, even though she allegedly knew that these assurances were false. They also sought to hold Citibank liable for the purported fraud on the theory that Ms. Ontko was acting as Citibank's agent.[4]

- Count III is a claim that Citibank made fraudulent misrepresentations to Mr. Neff with regard to a mortgage modification he was seeking. They alleged that Citibank employees orally falsely told Mr. Neff (i) that to be considered

_____

[2] The specific damages that they alleged are injury to their credit and increased interest and insurance rates; inability to obtain financing for personal and business needs; loss of a potentially lucrative oil and gas lease, including bonus payments, royalties and possible well pad fees; possible loss of the value of Parcels One and Two. In the event that the mortgage foreclosure action is successful, punitive damages; attorneys' fees and costs; and such other and further damages as may become apparent.

[3] Count IV was a Slander of Title action that was dismissed by the trial court because they failed in their complaint to point to any false statement published by PennyMac. On appeal, we affirmed. *Neff v. PennyMac Corp.*, No. 1568 WDA 2016, 2017 WL 2629458, at *1 (Pa. Super. Ct. June 19, 2017).

[4] Because of the way we have resolved this matter, we not need address whether Ms. Ontko was Citibank's agent when she made the alteration to the Mortgage.

for a loan modification, his loan had to be "in arrears," (ii) that he would "easily qualify" for a loan modification, (iii) that if he accepted the terms proposed to him and made a mortgage payment on June 30, 2010, no mortgage foreclosure process would begin while his modification request was being considered, and (iii) that his loan modification request was "qualified" on Citibank's computer. The Neffs contend that relying on those false misrepresentations caused them to stop making mortgage payments that led to foreclosure.

• Count V is a claim against Citibank, based on the same allegations described in Count III that constituted a violation of the Pennsylvania's Unfair Trade Practices and Consumer Protection Law. They also claimed that PNC's alteration of the Mortgage violated the same Act.

## II.

## A.

After the pleadings were closed, discovery commenced. Regarding the negotiation and execution of the Mortgage, Mr. Neff testified that he went to PNC's Moraine Pointe branch office and spoke with PNC's financial sales consultant, Marilou Hollinger, about refinancing a 2006 mortgage on their property that they had with PNC. That mortgage, entered into before the Property was subdivided, necessarily encumbered both Parcels One and Two. He testified that he had subdivided the Property and desired to have only one parcel of their Property, the one upon which their home was located, encumbered by the Mortgage, not the other 18.66-acre parcel and was assigned No. 250-1F104-3B as its tax identification number (Parcel Two). (R. 909a-10a).

Mr. Neff stated that Ms. Hollinger told him that she would need to have this approved by others at PNC, and later Ms. Hollinger informed him that his request for the loan to be secured only by the parcel on which his and his wife's home was located had been approved. *Id*. He also testified that he witnessed Ms. Holinger speak with Gino Perri, who worked in the Expanded Credit Program with PNC, after which Ms. Hollinger confirmed that PNC was willing to accommodate their request. (R. 2171a-72a).

He went on to testify that the Mortgage he and his wife executed at closing clearly identified only Tax Parcel No. 250-1F104-3 (Parcel One) as being the only parcel encumbered by the Mortgage. He testified that sometime after they executed the Mortgage, the Mortgage was altered without their knowledge or permission to add the 18.66-acre parcel of land to the Mortgage in clearly visible pen and ink, Tax Parcel No. 250-1F104-3B (Parcel Two). (R. 912a–13a).

Both Neffs testified that the Mortgage documents presented to them at closing did not contain Exhibit A to the mortgage. (R. 912a). They admitted, though, that they did not believe that PennyMac had any direct involvement in altering the mortgage. They also admitted that they had no contact with Ontko, the person at PNC who made the alteration. (R. 936a-37a).

Ms. Hollinger, in her deposition, testified that she could not remember whether the Neffs told her that they only wanted one parcel encumbered by the Mortgage or that the Property was subdivided for that purpose. (R. 2319a-

23a).  She testified that mortgage documents for mortgages originating from her office are prepared by the mortgage department at PNC Bank and she simply has the borrowers execute the documents at closing.  She testified that at the time the Mortgage was executed, the alteration was not present and she did not know who made it.  (R. 2317a-18a).  She testified that she did not know or have not have any contact with Ms. Ontko, the person who had made the alteration.  (R. 2241a, 2249a-50a).

Lucille Ontko testified that she had no contact with the Neffs or Ms. Hollinger about this transaction, and that she was not aware that a subdivision had occurred or that the Neffs allegedly wanted only one parcel listed on the Mortgage.  (R. 2213a-14a).  She also testified that her sole responsibility with PNC was to review mortgages for accuracy using property/collateral information provided to her by the bank and underwriting prior to recording, and to correct any errors on the face of mortgages based upon the property/collateral information she had.  (R. 2212a-14a.).  Her alteration on the Mortgage was simply intended to correct an error because she believed, based upon the Property report, that the second tax parcel number should be listed on the Mortgage prior to recording.  (R. 335a, 337a-39a).  She also testified that she made those changes without consultation with anyone else. (R. 2209a, 2012a).  She was unaware that adding the second parcel number to the Mortgage was contrary to the Neffs' alleged intent.  (R. 2217a-18a).

Gino Perri, who worked in the Expanded Credit Program with PNC at the time, confirmed that Ms. Ontko's role was to correct errors on the documents and the property information report provided to her. He does not recall any communication with the Neffs or Ms. Ontko during the transaction or Mortgage (R. 2337a-39a). He does not remember Ms. Hollinger or speaking with her during the process of this transaction. (R. 2329).

**B.**

Regarding his claim that misrepresentations by Citibank employees caused him to stop making payments, in his deposition, Mr. Neff testified that he called Citibank to inquire about getting the interest rate on his loan reduced. He contended that he spoke with an agent, servant and/or employee of Citibank who identified herself as "Victoria." He testified that Victoria told him that he had to get behind on the loan payments before Citibank could modify his loan. (R. 915a). Based upon the "tone" of the conversation, he testified that he believed that Victoria was encouraging him that this was the path he should follow to get the lower rate.

Contending that he acted on reliance upon Victoria's statement that if he got behind on his payments on the loan, he could be eligible for a loan modification, Mr. Neff testified that he stopped making the loan payments in order to be eligible for a loan modification. *Id.* He contended that in the months that followed, he had numerous telephone calls and e-mail and fax communications with Citibank representatives, most of whom either

reiterated the remarks of their colleagues or otherwise assured and reassured Mr. Neff that he would "easily qualify" for a loan modification, and that it was not necessary that he make payments on the loan as his modification request was being considered, as they would be added on at the end of the loan period, and that no foreclosure action would commence while his request for loan modification was being considered. **See** Affidavit of Eric Scott Neff dated October 2, 2018. (R. 814a).

As outlined in its brief and from our independent review, the numerous contacts that Mr. Neff had with Citibank and its contemporaneous business records of notes of the phone calls between Mr. Neff and Citibank show that on March 26, 2010, Mr. Neff called Citibank to inquire about possible payment relief options. (R. 438a-39a). A Citibank representative suggested that Mr. Neff submit an online application for mortgage assistance. **Id.** Mr. Neff followed up with a call to Citibank in April 2010 to inquire about what loss mitigation options might be available. (R. 440a-42a). A Citibank representative told Mr. Neff that he was "not prequalified" for a modification under the federal government's Home Affordable Modification Program (HAMP),[5] and that there were "no other options available" for accounts that

_____

[5] HAMP aims to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels. **See HSBC Bank v. Donaghy**, 101 A.3d 129 (Pa. Super. 2014).

were current. *Id.* At that time, HAMP was available to borrowers who were "in default" or "at imminent risk of default." (R. 647a, 649a).

Citibank's contemporaneous business records showed that on May 5, 2010, Mr. Neff again spoke with a Citibank representative about a loan modification. (R. 446a-48a). During this call, Citibank suggested that Mr. Neff consider establishing recurring payments for the account. (R. 446a-48a). Those records showed Mr. Neff "declined," stating that he did not "know when he is going to make another [payment] on this account" and that he wanted to wait until after he spoke with someone in Citibank's loan modification department. *Id.* One week later, Mr. Neff called Citibank and told representatives that "he does not want to get [the] loan caught up & not get [a] mod[ification]." (R. 443a-45a). During that call, the Citibank representative explained to Mr. Neff that a payment was still due. *Id.* Throughout June 2010, Citibank repeatedly urged Mr. Neff to make his regular mortgage payments. On June 7, 2010, Mr. Neff called Citibank to complain about receiving "collection calls even though he is working on a modification. (R. 453a-54a). The Citibank representative explained that regular payments "are to be m[ade] until" he receives a "letter telling him to start mod trial [payments]." *Id.* A few days later, Mr. Neff announced that he refused to make any further payments "because of the high interest rate." (R. 451a-52a). The Citibank representative explained that the monthly payments were still due despite the Neffs' efforts to obtain a loan

modification. *Id.* Mr. Neff disagreed, claiming that he had been "told that he would only have to make a lower trial [payment] amount once that is determined." *Id.* The Citibank representative "apologized" and said that Mr. Neff "was misinformed." *Id.* Mr. Neff hung up before any further clarification could be given. *Id.*

On June 29, 2010, Mr. Neff called Citibank "to talk about what he felt was supposed to happen" regarding his loan modification. (R. 455a-56a). Mr. Neff stated "he was supposed to get a rate reduction as of June 4th and still hadn't heard anything." *Id.* The Citibank representative explained to Mr. Neff that he was mistaken and that his request for a loan modification had not yet been sent to him. He advised Mr. Neff that a monthly payment was needed "by tomorrow" to prevent the account from "being assigned for foreclosure." *Id.* The Neffs made a single regular payment approximately one week later, on July 8, 2010. (R. 475a). Even after making this payment, they were still three months behind on their payments. (R. 469a-75a).

In July 2010, a HAMP application was sent to the Neffs. On or about July 22, 2010, the Neffs submitted a HAMP loan modification application to Citibank. (R. 524a-25a). On the first page of the application, the Neffs were asked whether the property was "Owner Occupied," "Renter Occupied" or "Vacant." The Neffs marked "Owner Occupied" with a notation "part-time due to working out of town." (R. 524a). On the next page, however, the Neffs certified "under penalty of perjury" that "my property is owner-

occupied" and that they intended "to reside in this property for the next twelve months." (R. 525a.) At that time, HAMP was limited to "owner-occupied single family properties" and Citibank was required to verify "occupancy."

However, at the time they submitted their HAMP application to Citibank, the Neffs were living at their home in Tennessee for much of the year. (R. 578a, 587a-89a). The letter that Citibank sent to Mr. Neff along with the HAMP application explained that they should complete the application and provide "the required documentation of your income" so that Citibank could determine if the Neffs "meet the eligibility criteria" for a HAMP loan modification. (R. 527a). The letter also instructed the Neffs to "[c]ontinue to pay your current monthly mortgage payments" while their application was pending. *Id.* It explained that "[i]f you meet the eligibility criteria, you will be offered a Trial Period Plan" under which the "monthly trial period payments will be based on the income documentation that you provide" and would be an "estimate of what your payments will be if we are able to modify your loan under the terms of the program." *Id.* The letter also explained that Citibank would not "determine whether you qualify for a Home Affordable Modification of your loan" until after "we receive all of your documentation and verify your information." (R. 530a). Finally, Citibank stated that if plaintiffs did "not qualify for a loan modification" then Citibank would "work with you to explore other options." (R. 527a, 537a).

Citibank records then showed that throughout the second half of 2010 and early 2011, Citibank worked with Mr. Neff to collect the information it needed to evaluate the Neffs' eligibility for a loan modification. (R. 435a-36a, 460a-61a, 527a-44a). On or about March 1, 2011, Citibank discovered that the Neffs' home on Parcel One was vacant. It determined that Mr. Neff did not qualify for any kind of loan modification because "[n]either HAMP or a Supplemental Mod policy allow for the property to be vacant." (R. 432a, 434a). Days later, a Citibank representative spoke with Mr. Neff to inform him that his request for a modification "has been declined due to the property being vacant." (R. 431a). During this call, Mr. Neff acknowledged, "there's nobody in the home," but claimed that the Neffs were "moving back in a month." In July 2011, Mr. Neff spoke with a Citibank representative and said that he "was temporarily reassigned out of state" but that he would be returning to the Property in approximately "45 days and would then be interested in pursuing [a] mod again." (R. 428a). In fact, the Neffs did not return to permanently reside in Pennsylvania until 2014. (R. 589a).

**III.**

After discovery was closed, motions for summary judgment were filed by the parties.[6]  In its motion for summary judgment, PNC contended that there is no material fact that would establish that:

- It intended to defraud the Neffs;

- They engaged in any deceptive conduct cognizable under the Unfair  Practice Act;

- That any damages were caused by the alteration of mortgages but stem from the foreclosure action due to the Neff's failure to pay their mortgage; and

- That there was any breach of contract because of Ontko's alteration because, again, any claimed damages stem from the foreclosure action.

Citibank  argued that it was entitled to summary judgment for similar reasons contending that the Neffs could not establish that it:

- made a false statement with the intent to deceive or that their injury was proximately caused by the fraud;

- made a false representation in regard to their loan modification request because there is no evidence of any intent to mislead, that there was a lack of justifiable reliance on the Neffs' part, and, even if a misrepresentation occurred, there was a lack of proximate causation for any damages that they incurred;

---

[6] The Neffs also filed a motion for summary judgment claiming that PNC would be unable to establish the elements necessary to proceed with a counterclaim for reformation of the Mortgage because they impermissibly altered the Mortgage.  We have dealt with that issue in **PennyMac Corp v. Eric Scott Neff and Naoma D. Neff,** 727 WDA 2019 (filed _____. 2020).

- engaged in any deceptive conduct cognizable under the UTPCPL in connection with the origination of the 2007 Mortgage or the 2010 request for loan modification, no justifiable reliance, and that the damages alleged are not an "ascertainable loss of money or property" as required by the UTPCPL.

The trial court granted PNC and Citibank's motions for summary judgment as to all counts.[7] As to PNC, the trial court found that the facts of record did not support a fraud claim because there was no evidence that PNC or any PNC employee or agent made any misrepresentations or intended to deceive the Neffs during any discussions about the Mortgage. It pointed out that the Neffs only spoke with Ms. Hollinger regarding the terms of the Mortgage and there was no evidence that she made a false representation. It also pointed out that the Neffs did not have any communication, directly or indirectly, with Ms. Ontko regarding the Mortgage, which meant that Ms. Ontko could not have made any misrepresentations to the Neffs. The trial

_____

[7] "When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion." *Swords v. Harleysville Insurance Companies*, 883 A.2d 562, 566–67 (Pa. 2005) (citations omitted).

court also found that there was no violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. §§ 201-1, *et seq.*, because there was no evidence of deceptive conduct by Ms. Hollinger, Ms. Ontko or any other PNC employee.

It went on to find that alleged damages were caused by the Neffs' failure to make payments resulting in the mortgage foreclosure action because they were not even aware of the alteration to the Mortgage when they decided to stop making mortgage payments. Correspondingly, it also found that there was no breach of contract because there was no causal connection between the material alteration of the Mortgage and the damages they claim because those damages stem from the foreclosure action, not from the alleged alteration of the Mortgage.

As to Citibank, the trial court concluded that there was no evidence of any misrepresentations or deception by Citibank with respect to the documentation of the 2007 Mortgage or Mr. Neff's efforts to obtain a loan modification. (R. 2918a-19a). The court found no evidence to support the Neffs' assertion that Ms. Ontko was acting as an agent for Citibank when she altered the 2007 Mortgage. After the trial court denied their motion for summary judgment, the Neffs filed this appeal.

**IV.**

On appeal, the Neffs contend that the trial court erred in granting PNC and Citibank's motions for summary judgment because neither PNC nor

Citibank intended to engage in a fraudulent representation of the terms of the Mortgage. They argue that the trial court erred because they did not plead a claim in fraudulent representation but, in fraud, which is broader than fraudulent representation. Citing to **La Course v. Kiesel**, 77 A.2d 877 (Pa. 1951), "the word 'fraud' is a generic term which embraces a great variety of actionable wrongs and may be actual or constructive accordingly as it is knowingly or innocently made." Here, they contend that the fraud that PNC and Citibank committed is when Ms. Ontko altered the Mortgage after it had been executed. (R. 404a). Simply, the Neffs now contend that even if the alteration of the Mortgage by adding Parcel Two was a mistake, innocently made, nonetheless, PNC and Citibank still committed fraud.

In **Delahanty v. First Pennsylvania Bank**, 464 A.2d 1243, 1251–1252 (Pa. 1983), our Supreme Court provided an expansive definition of what is "fraud in general" as follows:

> Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It has been said that fraud may induce a person to assent to something which he would not otherwise have done, or it may induce him to believe that the act which he does is something other than it actually is. To be actionable, the misrepresentation need not be in the form of a positive assertion. It is any artifice by which a person is deceived to his disadvantage. It may be by false or misleading allegations or by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment. It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false. It has also been

- 18 -

established that "the deliberate nondisclosure of a material fact amounts to a culpable misrepresentation no less than does an intentional affirmation of a material falsity." **Neuman v. Corn Exchange National Bank & Trust Co.**, 356 Pa. 442, 450–52, 51 A.2d 759, 764 (1947**). Yet, a misrepresentation innocently made is also actionable if it relates to a matter material to the transaction involved;** while if the misrepresentation is made knowingly or involves a non-privileged failure to disclose, materiality is not a requisite to the action. The elements of fraud are as follows: " 'there must be (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result.' " "[I]f [a] misrepresentation is knowingly made or involves a non-privileged failure to disclose, materiality is not a requisite to the action." **Shane v. Hoffmann**, supra 227 Pa. Super. at 182, 324 A.2d at 536, citing **DeJoseph v. Zambelli**, 392 Pa. 24, 139 A.2d 644 (1958).

*** * ***

A misrepresentation is material when it is of such a character that if it had not been made, the transaction would not have been entered into. (Citations omitted; emphasis added).

While **Delahanty** set forth this expansive definition of fraud, in **Bortz v. Noon**, 729 A.2d 555, 560 (Pa. 1999), our Supreme Court refined that definition by explaining that "fraud" can be made out under three different types of misrepresentation:

1. intentional or fraudulent misrepresentation - occurs when a party to a contract knowingly makes an untrue statement of fact which induces the other party to enter that contract. **Id.** at 560; **Gibbs v. Ernst**, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994), *citing,* Restatement (Second) of Torts § 525 (1977).

2. Negligent misrepresentation - occurs when there is a misrepresentation of a material fact where the person, under the circumstances ought to have known its falsity and is made with the intent to induce the other party to act. **Bortz** at 561. **See**

- 19 -

Restatement (Second) Torts § 552. **See, e.g.,** **DeJoseph v. Zambelli**, 392 Pa. 24, 139 A.2d 644 (1958). Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another. **Id.**

3. Innocent misrepresentation - occurs when the person making the material misrepresentation had reasonable grounds for believing it was true at the time that induced the other party to enter into the contract. **Bortz** at 563-564. **See, e.g.,** **DeJoseph v. Zambelli**, 392 Pa. 24, 139 A.2d 644 (1958); **La Course**.

While the Neffs have previously advanced a fraudulent inducement claim which requires an intentional misrepresentation,[8] they appear now to shift their argument to one that Ms. Ontko's alteration of the Mortgage to encumber Parcel Two, even though innocently made, was nonetheless actionable fraud.

Because the addition of Parcel Two was a material representation, the Neffs were only required to establish that PNC and/or Citibank made a misrepresentation to them that caused them to enter into the Mortgage that they otherwise would not have entered. A misrepresentation is "[a]ny manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts. An untrue statement of fact. An incorrect or false representation. That which, if accepted, leads the mind to an apprehension of a condition other and different from that which exists." **Black's Law Dictionary** 1001 (6th ed.

---

[8] Paragraph 58 of their amended complaint provides that the Mortgage was "wrongfully, fraudulently, dishonestly and deceitfully altered . . . "

1990); ***Office of Disciplinary Counsel v. Anonymous Attorney A***, 714 A.2d 402, 405 (Pa. 1998).

When the Mortgage was executed, it only encumbered what the Neffs agreed was to be encumbered - Parcel One.  Necessarily, that means that no PNC employee could have made a material misrepresentation to them up until the Mortgage was executed.  The purported fraud - Ms. Ontko's alteration - while it may or may not have been improper – could not be considered fraud of any sort because she made no misrepresentation to the Neffs because they had no contact whatsoever with her.  Accordingly, the trial court did not err in dismissing the fraud count.

### V.

The Neffs also contend that the trial court erred in granting PNC's summary judgment claim on violations of the UTPCPL.  PNC claims there is no evidence that any PNC employee engaged in any deceptive conduct.

The objective of the UTPCPL to "place on more equal terms seller and consumer."  ***Commonwealth v. Monumental Prop., Inc***., 329 A.2d 812, 816 (Pa. 1974).  Specifically, Section 3 of the UTPCPL provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by ... section 2 of th[e] act and regulations promulgated under section 3.1 of this act are hereby declared unlawful."  73 P.S. 201–3.  Section 2 of the UTPCPL enumerates 17 specific acts which constitute unfair or deceptive acts or practices.  The Neffs contend

that PNC's conduct falls within the catch-all provision which makes unlawful "[e]ngaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

In **Bennett v. A.T. Masterpiece Homes**, 40 A.3d 145 (Pa. Super. 2012), we held that a consumer was not required to prove that the business acted with the intent to defraud in order to state a claim under the catch-all provision. However, we did not address whether there would be good faith defenses available even if their conduct created a misunderstanding. We answered that question in **Gregg v. Ameriprise Financial, Inc.**, 195 A.3d 930 (Pa. Super. 2018), **reargument denied** (Nov. 21, 2018), **permission for allowance of appeal granted**, 216 A.3d 222 (Pa. 2019), where we held that the catch-all provision imposed *strict liability* on businesses. We held that if there is a likelihood of confusion or misunderstanding by the consumer, it does not matter whether the conduct was "committed intentionally (as in a fraudulent misrepresentation), carelessly (as in a negligent misrepresentation), or with the utmost care (as in strict liability)." 195 A.3d at 939. In other words, a consumer need not establish that the business was negligent or acted intentionally. Rather, to succeed on a claim under the catch-all provision, a consumer need only prove that the business's conduct "has the tendency or capacity to deceive."

We reasoned that if the General Assembly had intended to limit the catch-all provision to negligent misrepresentation claims, it could have

outlawed only "fraudulent or negligent conduct" rather than "any deceptive conduct." We went on to observe that a UTPCPL violation "is not amenable to excuses" because a commercial transaction "occurs in a designed setting entirely of the vendor's creation via preplanned marketing schemes." We noted that consumers are at a disadvantage because they "may be especially reliant upon a vendor's specialized skill, training and experience in matters with which consumers have little or no expertise." As a result, we held that "the legislature has placed the duty of UTPCPL compliance squarely and solely on vendors."

The Neffs contend that there is substantial evidence of deceptive conduct by PNC in the origination and post-closing alteration of their Mortgage. They contend that the communications they had with Ms. Hollinger were that they intended to limit the coverage of the Mortgage to only Parcel One and Mr. Perri approved that request. (R. 908a-09a). They also contend that PNC drafted the closing documents and that it is undisputed that the Mortgage that they executed only encumbered Parcel One, and it undisputed that Ms. Ontko added Parcel Two post-closing.

However, accepting all of that as true, as well as recognizing that there is strict liability under the UTPCPL for any conduct that deceives or creates a misunderstanding, the Neffs are still required to establish that they were deceived in entering the Mortgage.

Again, at the time the Mortgage was executed, there is no evidence that any one was deceived as to what the Mortgage encumbered simply because it encumbered what the Neffs, Ms. Hollinger and Mr. Perri all agreed to encumber. Any purported harm to them was caused by Ms. Ontko's alteration by adding Parcel Two after the Mortgage had been executed. A misrepresentation requires someone to convey by word or action something that is not true, causing that person to act in reliance on that misrepresentation. Because the Neffs never had any contact whatsoever with Ms. Ontko, there is no way that she could have deceived them or created some misunderstanding on their part. Accordingly, because they have failed to establish any deception or misunderstanding at all by PNC and/or Citibank that caused them to enter into the Mortgage as a result of Ms. Ontko's unilateral alteration, they have failed to make out a claim under the UTPCPL.

**VI.**

As to the trial court's grant of summary judgment on the breach of contract claim, the Neffs are required to establish (1) the existence of a contract; (2) the breach of a duty imposed by the contract; and (3) the resultant damages. ***Burlington Coat Factory of Pennsylvania, LLC v. Grace Const. Mgmt. Co., LLC***, 126 A.3d 1010, 1018 (Pa. Super. 2015). "Resultant damages" are those "damages suffered from the breach." ***412 N. Front St. Assocs., LP v. Spector Gadon & Rosen, P.C.***, 151 A.3d. 646, 657 (Pa. Super. 2016) (quoting from ***McShea v. City of Philadelphia***, 995 A.2d

334, 340 (Pa. 2010).  ***See also***, ***Logan v. Mirror Printing Co. of Altoona, Pa.,*** 600 A.2d 225, 226 (Pa. Super. 1991) ("In order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss.").

The Neffs contend that the trial court erred in granting PNC's motion because any damages they claimed from a change in oil and gas lease terms stemmed from the mortgage foreclosure action, not the alteration of the Mortgage.  It is undisputed that the Neffs have entered into the following oil and gas leases since the Mortgage was recorded encumbering both properties:

- In January 2007, after the Property had been subdivided, the Neffs granted a mineral lease on the entire property to Phillips Production Company.  (R. 2386a, 2388a).

- After the commencement of the foreclosure action, the Neffs negotiated with XTO a new oil and gas lease (New Lease), dated January 27, 2012, to replace the existing 52-acre lease.  (R. 2281a-85a).  Upon discovering the pending foreclosure action, XTO declined to approve the New Lease.  (R. 2390a).

- The Neffs then entered into a 32-acre lease with XTO covering parcel 1F104-4 dated February 22, 2012 ("First Lease").  (R. 2292a-96a).  The First Lease had the same royalty and rental payment terms as the unapproved New Lease.  (R. 2281a-85a and 2292a-96a).

- Over a year later, the Neffs leased their remaining 20 acres with XTO (Second Lease).  (R. 2306a-08a).

They contend that as a direct result of the Mortgage alteration, the negotiated terms between the First Lease were less favorable than the Second

Lease causing them direct and substantial damages. However, the evidence shows no such correlation.

What the evidence shows is that the foreclosure action and the alteration of leases occurred prior to the negotiations of all three leases with XTO. In a February 1, 2012 letter to the Neffs from Holland Services, XTO's leasing agent states that the New Lease was not approved because of the pending foreclosure action, stating:

> on review of the property title, our Title Department has found a pending foreclosure which has the possibility of taking ownership out of your name. Until foreclosure proceedings are completed, we are unable to approve your lease. (R. 2390a).

John Maloy, XTO's corporate designee, also testified that XTO's decision not to approve the New Lease was related entirely to the foreclosure proceedings. (R. 2401a at 53:2-10). Mr. Maloy found no evidence in XTO's records indicating that XTO had any concerns about the alleged alteration of the 2007 Mortgage. Nor did he have any independent knowledge of any such concern by anyone at XTO. (R. 2401a at 53:6-10). He went on to testify that the Neffs' various oil and gas leases were set to expire and would not be renewed because their Property was outside of unitized acreage. This decision had nothing to do with any litigation. (R. 2397a at 29:12-30:1; R. 2399a at 46:10; and R. 2400a at 47:21).

Because there is no evidence to show that XTO's decision to not approve the New Lease had anything to do with PNC and/or Ms. Ontko's alleged "alteration" of the 2007 Mortgage or that anything other than the foreclosure

action was the reason it did not approve the New Lease, none of the Neffs' claimed damages flow from the alteration of the lease. Accordingly, because no damages flow from the alteration of the Mortgage, the trial court properly entered summary judgment to PNC on the breach of contract claim.

## VII.

The Neffs contend that the trial court erred in dismissing their UTPCPL claim because there was no evidence of fraud, misrepresentation or deception on the part of Citibank. They contend that there is sufficient evidence to show that Citibank made material misrepresentations when they told Mr. Neff:

- that to be considered for a loan modification, his loan had to be "in arrears;"

- that he would "easily qualify" for a loan modification; and

- that if he accepted the terms proposed to him and made a mortgage payment on June 30, 2010, no mortgage foreclosure process would begin while his modification request was being considered.

The Neffs contend that they relied on those misrepresentations that caused them to stop making mortgage payments that led to foreclosure that led to their purported damages.

As to the representation that Mr. Neff had to get behind on payments to be eligible for loan relief, he stated that "Victoria," a Citibank employee, told him that he had to get behind on the loan payments before Citibank could modify his loan and based upon the "tone" of the conversation, he believed that Victoria was encouraging him to do so and that this was the path that he

- 27 -

should follow to get the lower rate which he sought. Deposition of Eric Scott Neff at 62-65 (R. at 915a).[9]

Even if Mr. Neff's subjective interpretation of a "tone" in a person's voice was sufficient for him that he needed to "get behind" on his loan payments in order to be eligible for a loan modification, that was not a misrepresentation.

At that time, eligibility for a HAMP loan modification required that the borrower be "in default" or "at imminent risk of default." (R. 647a). Because the purported representations as Mr. Neff himself described were not false, he was not deceived in that claim. *See, e.g.*, ***Walkup v. Santander Bank, N.A***., 147 F. Supp. 3d 349, 362 (E.D. Pa. 2015) ("All Plaintiffs have alleged is that PHH told them—accurately—that they could not be considered for HAMP modification while their loan payments were current … a factual response about HAMP eligibility in response to Plaintiffs' loan modification inquiry is not deceptive."); ***Rich v. BAC Home Loans Servicing LP***, 2014 WL 7671615, at

_____

[9] "[L]oan history documents are records of regularly conducted activity, or business records, and would be admissible at trial with proper foundation." ***Bank of Am. v. Gibson***, 102 A.3d 462, 467 (Pa. Super. 2014) (citing Pa.R.E. 803(6) (affirming summary judgment); ***MB Fin. Bank v. Rao***, 201 A.3d 784, 789-790 (Pa. Super. 2018) (trial court erred in declining to apply hearsay exception to bank's authenticated business record). Recently, the Pennsylvania Supreme Court held that the business records exception to the hearsay rule extends to business records generated by a prior loan servicer. ***Bayview Loan Servicing LLC v. Wicker***, 206 A.3d 474, 486 (Pa. 2019). Thus, there can be no doubt that Citibank's business records were admissible to show what the parties said to one another.

*9 (D. Ariz. Oct. 9,2014), **aff'd**, 666 F. App'x 635 (9th Cir. 2016) ("[the bank representative] was correct that Plaintiffs could be considered for HAMP only if they were behind on at least two mortgage payments"). We also note that at the time he made his first inquiry, he was already two months behind on his loan payments.

As a result of his inquiry, Mr. Neff received the HAMP application,[10] and the letter Citibank sent to him with the HAMP application, explained, among other things, that they should "[c]ontinue to pay your current monthly mortgage payments" while their application was pending. **Id.**

Mr. Neff alleges that Citibank representatives purportedly told him that he could "easily qualify" for a loan modification and, once approved, he could "start over clean." (R. 152a-53a). However, the Neffs do not contend that Citibank representatives guaranteed that they would receive a loan modification. At no point did Citibank tell the Neffs that they were approved for a modification. (R. 579a). As Mr. Neff acknowledged: "Nobody said

_____

[10] The Neffs contend that they were erroneously routed into Citibank's program set up pursuant to HAMP, a federal program to allow lenders to service homeowners who had defaulted on their mortgage payments or were likely to do so. Mr. Neff contends that all he was seeking was rate relief from the terms of the existing Mortgage. We do not see how that is a misrepresentation within the meaning of the UTPCPL. In any event, the letter sent by Citibank with his HAMP application stated that if they did "not qualify for a loan modification" then Citibank would "work with you to explore other options." (R. 527a, 537a).

'you're qualified.' No one told me that." (R. 576a). At most, Citibank stated that "if approved" the Neffs would "start over clean." (R. 153a).

Moreover, a person cannot qualify for a HAMP loan modification when he does not meet one of its prerequisites. At the time of their application, HAMP only applied to owner-occupied properties. In their July 2010 HAMP application, the Neffs indicated under the penalty of perjury that the Property was "Owner Occupied" with a notation "part-time due to working out of town." They also certified that they intended "to reside in this property for the next twelve months." (R. 525a). Citibank was required to verify "occupancy."

At the time the Neffs submitted this HAMP application in July 2010, they were living at their home in Tennessee for much of the year. (R. 578a, 587a-89a). When Citibank determined that the Property was vacant, they determined that Mr. Neff did not qualify for any kind of loan modification because "[n]either HAMP nor a Supplemental Mod policy allow for the property to be vacant." (R. 432a, 434a). During this call informing him that his application had been denied because the Property was vacant, Mr. Neff acknowledged that "there's nobody in the home," but claimed that they were "moving back in a month." In July 2011, Mr. Neff spoke with a Citibank representative and said that he "was temporarily reassigned out of state" but that he would be returning to the Property in approximately "45 days and would then be interested in pursuing [a] mod again." (R. 428a). In

- 30 -

fact, the Neffs did not return to permanently reside in Pennsylvania until 2014. (R. 589a).

Finally, the Neffs claim that they were told that Citibank "would not commence a mortgage foreclosure proceeding while Eric Scott Neff was being considered for a loan modification." (R. 154a). However, Citibank did not begin foreclosure proceedings until after the Neffs modification application was denied: the denial occurred on or around March 1, 2011, and the foreclosure action was filed in April 2011. (R. 432a, 53a).

Because there is no evidence that Citibank made any misrepresentation or engaged in any deceptive conduct, the trial court properly granted summary judgment on the UTPCPL claim in regard to the Neffs' loan modification on the part of Citibank.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/20/2020